UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    :

        -v-                                  :     S4 11 Cr. 184 (DLC)

CALIEB BARNES,                               :
    a/k/a "Lieb,"
    a/k/a "Grimey,"                          :
    a/k/a "Goonie," and
GREGORY PLASKETT,                            :
    a/k/a "Light,"
    a/k/a "Skins,"                           :
    a/k/a "Skinz,"
                           :

           Defendants.    :
- - - - - - - - - - - - - - - - X

**GOVERNMENT'S MOTIONS IN LIMINE**

 

                             PREET BHARARA
                             United States Attorney for the
                             Southern District of New York,
                             Attorney for the United States
                                  of America

Laurie A. Korenbaum
Timothy D. Sini
Assistant United States Attorneys
      - Of Counsel -

## Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . i

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   1.   The Charges . . . . . . . . . . . . . . . . . . . . . . . 2

   2.   Calieb Barnes's Drug Spot and the Murder of Raymond McNeil . . . . . . . . . . . . . . . . . . . 4

Discussion  . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   I.   The Court Should Permit the Government to Elicit Evidence of Statements That Two Murder Victims – Raymond McNeil and Roy Walker – and Drug Customers Made to Certain of the Cooperating Witnesses. . . . . 6

      A.   Background . . . . . . . . . . . . . . . . . . . 6

      B.   Applicable Law . . . . . . . . . . . . . . . . . 8

      C.   Discussion . . . . . . . . . . . . . . . . . . 11

   II.   The Court Should Preclude the Defense from Eliciting Testimony or Evidence of Certain Prior Bad Acts of Several of the Government's Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.   Background . . . . . . . . . . . . . . . . . . 13

      B.   Applicable Law . . . . . . . . . . . . . . . . 17

      C.   Discussion . . . . . . . . . . . . . . . . . . 19

   III   The Court Should Issue A Protective Order For 3500 Material. . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . 27

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          :

          -v-                      :    S4 11 Cr. 184 (DLC)

CALIEB BARNES,                     :
     a/k/a "Lieb,"
     a/k/a "Grimey,"               :
     a/k/a "Goonie," and
GREGORY PLASKETT,                  :
     a/k/a "Light,"
     a/k/a "Skins,"                :
     a/k/a "Skinz,"
                                   :
          Defendants.
                                   :
- - - - - - - - - - - - - - - - X
```

**GOVERNMENT'S MOTIONS IN LIMINE**

For the reasons that follow, the Government hereby moves, *in limine*, for the following relief with respect to the trial presently scheduled to begin on March 19, 2012, in this case:

(1)  An order permitting the Government to elicit evidence of statements that a murder victim – Raymond McNeil – made to cooperating witnesses concerning (1) the murder of a drug dealer committed by McNeil with Barnes in order to protect their drug territory; (2) an ongoing feud between McNeil and Barnes over their drug business; (3) McNeil's concern that Barnes was going to harm him as a result of their feud; and (4) an incident when McNeil obtained a gun and pointed it at Barnes's car.

(2)  An order permitting the Government to elicit evidence of statements that a murder victim – Roy Walker, a/k/a "Deucy" – made to several cooperating witnesses that Calieb Barnes had given Walker a gun.

(3)  An order permitting the Government to elicit evidence of statements made by Barnes's drug customers to at least one cooperating witness that the customers were

     intending to purchase drugs from Barnes at Barnes's drug locations

(4) An order precluding the defendants from eliciting testimony or evidence of certain prior bad acts of cooperating witnesses.

**Introduction**[1]

## 1. The Charges

Calieb Barnes and Gregory Plaskett are charged in a ten-count superseding indictment with conspiring with others to distribute at least 280 grams of crack cocaine from approximately 2000 through approximately November 2010, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A) (Count One; Barnes and Plaskett); possessing and using firearms in furtherance of the drug conspiracy charged in Count One, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) (Count Two; Barnes and Plaskett); conspiring to commit the Hobbs Act robbery of a narcotics dealer in or about June of 2006, in violation of Title 18, United States Code, Section 1951 (Count Three; Barnes only); attempting to commit the Hobbs Act robbery of a narcotics dealer in or about June 2006, in violation of Title 18, United States Code, Section 1951 (Count Four; Barnes only); possessing, using and brandishing a firearm in furtherance of the attempted Hobbs Act robbery charged in

---

[1] This introductory section is taken from, and is identical to, the Government's Memorandum of Law in Support of its Motion to Introduce Certain Evidence, dated March 3, 2012.

Count Four, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) (Count Five; Barnes only); intentionally murdering Raymond McNeil on or about May 15, 2010 while engaged in the narcotics conspiracy charged in Count One, in violation of Title 21, United States Code, Section 848(e)(1)(A) (Count Six; Barnes and Plaskett); possessing, using and discharging a firearm during the intentional murder of Raymond McNeil, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii) (Count Seven; Barnes and Plaskett); possessing a firearm during the course of the narcotics conspiracy charged in Count One that was used to murder Raymond McNeil, in violation of Title 18, United States Code, Section 924(j) (Count Eight; Barnes and Plaskett); conspiring with others to distribute an unspecified amount of marijuana, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(D)(Counts Nine; Barnes and Plaskett); and conspiring to distribute firearms, in violation of Title 18, United States Code, Section 371 (Count Ten; Barnes only).  Counts One through Eight charge conduct in connection with a retail crack cocaine spot run by Calieb Barnes from several locations in the vicinity of 211th Street and White Plains Road in the Bronx, New York, from at least 2000 through at least November 2010. Counts Nine and Ten charge conduct committed by Barnes after he abandoned the Drug Spot in approximately November/December 2010.

**2.    Calieb Barnes's Drug Spot and the Murder of Raymond McNeil**

On May 15, 2010, at around 4:00 a.m., Raymond McNeil, a local crack dealer, was gunned down in the vicinity of Holland Avenue and North Oak Drive in the Bronx, New York. Several witnesses reported to the police that they heard a number of gunshots, followed by the sound of a loud crash, then several more gunshots, and reported seeing the perpetrators flee from the scene after the shooting in a black BMW with blue headlights, turning on to Bartholdi Street, where the defendant Gregory Plaskett then resided.

When police arrived, they discovered McNeil hanging out of the sun roof of an SUV. McNeil had sustained several gunshot wounds to the arms and torso which caused his death. Ballistics from a .45 caliber semi automatic weapon and ballistics falling within the .38 caliber and 9 millimeter "class" were recovered from the crime scene and from McNeil's body.

The proof at trial will demonstrate that the defendants, Calieb Barnes and Gregory Plaskett, murdered McNeil after McNeil, once a close friend and criminal associate of Barnes, had a falling out with Barnes. Although Barnes made it clear that, after their falling out, he did not want McNeil selling drugs at the Drug Spot, McNeil persisted in doing so. As a result, McNeil was killed. The proof at trial will further demonstrate that, some months after the murder, a black BMW used by Barnes but

4

registered in the name of a girlfriend, was seized from a Bronx street.  Law enforcement officers turned on the headlights of that BMW pursuant to a court-authorized search warrant.  Those headlights are blue.

The proof at trial will also demonstrate that Barnes ran the Drug Spot and ruthlessly maintained control over his crack cocaine business through acts of violence, from at least 2000 to approximately November 2010.  The proof at trial will also demonstrate that, during the course of the narcotics conspiracy, Barnes, who was skilled at cooking powder cocaine into crack cocaine to sell at the Drug Spot, and others, attempted to rob a local drug dealer of kilograms of cocaine.  Several witnesses will testify that Barnes routinely carried, displayed, brandished and discharged firearms in furtherance of his drug and robbery crimes.

Finally, the proof at trial will also demonstrate that in approximately November 2010, Barnes abandoned the Drug Spot.  He did so for a number of reasons, including that he was wrongly being blamed for the murder of a local drug dealer that occurred in the vicinity of the Drug Spot.  But, Barnes's abandonment of the Drug Spot did not evince a desire on his part to end his life of crime.  To the contrary, telephone calls intercepted over a court-authorized wiretap of Barnes's cellphone and physical evidence seized, pursuant to court-authorized search warrants,

from Barnes's home and a storage facility maintained by Barnes, demonstrate that after he abandoned his crack cocaine business, Barnes was selling guns and brokering gun sales and was trying to start up a marijuana distribution business to replace his crack cocaine business.

## Discussion

**I.   The Court Should Permit the Government to Elicit Evidence of Statements That Two Murder Victims – Raymond McNeil and Roy Walker – and Drug Customers Made to Certain of the Cooperating Witnesses.**

### A.   Background

At trial, the Government will prove, among other things, that: (1) Raymond McNeil and Calieb Barnes, once close friends and criminal associates, had a falling out in the late 2000s over, *inter alia*, their drug business; (2) Raymond McNeil continued to sell drugs at Barnes's Drug Spot in spite of Barnes's directive that he not do so; and (3) Barnes refused to return McNeil's guns to him after McNeil got out of jail in 2010, including a gun that Roy Walker, a/k/a "Deucy," a drug dealer and close friend and associate of McNeil, specifically requested that Barnes give to him for his personal protection.  All of these things contributed to the bad blood between Barnes and McNeil, and contributed to Barnes's decision to kill Raymond McNeil.  The Government will call several cooperating witnesses who will

6

testify about statements made by McNeil and Walker concerning these matters.

In particular, the cooperating witnesses will testify that McNeil made the following statements to them:

- that McNeil and Barnes "laid down a Jamaican on the Ave.," *i.e.*, killed the Jamaican because the Jamaican was selling crack at the Drug Spot without permission to do so

- that for a period of time, McNeil was working with Barnes selling crack cocaine

- that Barnes was not paying his share of rent at a stash house maintained by Barnes and McNeil at 211th Street and White Plains Road

- that Barnes had not paid a sufficient share of money to their mutual drug supplier

- that McNeil wanted to kill Barnes, and more specifically, wanted to do so before Barnes could kill him, and statements made by McNeil as part of his effort to locate Barnes's residence so he could kill Barnes

- that one of the cooperating witnesses should watch his/her back because McNeil and Barnes were trying to kill each other and Barnes might try to harm the cooperating witness as a way of getting to McNeil[2]

---

[2]    In addition this material is relevant and admissible in explaining why the cooperating witness later offered to give Barnes an apartment that the cooperating witness used to sell drugs, so that Barnes could utilize the apartment to sell his own drugs.  The cooperating witness would testify that the reason the cooperating witness did so was out of fear of Barnes, based on the fact that McNeil had said that Barnes was seeking to harm McNeil and, possibly, the cooperating witness.

- that McNeil and Barnes ran the stash house at 211th Street and White Plains Road together and that the two of them were partners

A cooperating witness will also testify that Roy Walker, a drug dealer and close friend and associate of McNeil, told the cooperating witness that he had obtained a firearm from Barnes. Other witnesses will testify that Barnes gave the gun to Walker, that after Walker returned the gun to Barnes, Walker asked for the gun back, and that Barnes refused to give the gun to Walker. Further, a cooperating witness will also testify that Barnes refused to return guns to McNeil that belonged to McNeil.

Finally, the Government intends to elicit testimony from at least one cooperating witness that they were told by Barnes's customers that the customer were going to obtain crack from Barnes, and thereafter proceeded to enter one of Barnes's drug locations.

### B.   Applicable Law

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  The hearsay rule, however, has important exceptions.  One is that the hearsay rule does not exclude "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)."  Fed.

8

R. Evid. 803(3).  "Thus, '[i]f relevant,' a declarant's statement of his intent 'may be introduced to prove that the declarant thereafter acted in accordance with the stated intent.'" *United States* v. *Persico*, 645 F.3d 85, 100 (2d Cir. 2011) (quoting *United States* v. *Best*, 219 F.3d 192, 198 (2d Cir. 2000)).  There exist certain limitations on this exception.  One is that statements of intent are admissible to prove the declarant's future conduct, but not that of another person.  *Id.* (quoting Fed. R. Evid. 803 Advisory Committee Note (1974)).  The other is that "a statement of memory or belief [cannot be used] to prove the fact remembered or believed."  Fed. R. Evid. 803(3); *see also United States* v. *Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991).

In addition, the out-of-court statements of an unavailable declarant are admissible if the statements were against the declarant's penal interest.  *See* Fed. R. Evid. 804(b)(3); *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007).  A statement is sufficiently against the declarant's penal interest if:

> a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability.

9

*Id.*   Moreover, although "non-self inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson* v. *United States*, 512 U.S. 594, 600-01 (1994), a statement describing inculpatory acts committed by the declarant and a defendant are admissible in full as statements against the declarant's self-interest, especially where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant], or curry favor with authorities."   *Williams*, 506 F.3d at 155 (admitting statement by declarant that implicated declarant and defendant in shooting: "[W]e gave it to them niggers . . . [W]e walked up to the truck, each of us on a side of the truck and gave it to them niggers."); *accord United States* v. *Wexler*, 522 F.3d 194, 203 (2d Cir. 2008) (admitting statements that implicated both declarant and defendant); *United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) (admitting taped conversations implicating both the declarant and the defendant in joint criminal activity).   Finally, because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause.   *Williams*, 506 F.3d at 157.

**C.   Discussion**

Raymond McNeil's statements to cooperating witnesses about

10

his criminal relationship and joint criminal activity with Barnes, including problems the two were having over their drug business, and McNeil's belief that Barnes would kill him, are excepted from the bar on hearsay testimony.

First, all of Raymond McNeil's statements fall into the exception for statements against interest.  Raymond McNeil is "unavailable."  *See* Fed R. Evid. 804(a)(4) (explaining that a declarant is unavailable if he "is unable to be present or to testify at the hearing because of death").  Moreover, the statements are entirely self-inculpatory, as they amount to a description of the McNeil/Barnes drug organization, the problems the two were having relating to that drug organization, and McNeil's belief, based on the problems he was having with Barnes, that Barnes wanted to kill him and that he wanted to kill Barnes first, and the statements concerning those matters are not carefully crafted to inculpate someone else in order to minimize Raymond McNeil's role in the criminal conduct.  *Cf. Williamson* v. *United States*, 512 U.S. 594, 599-600 (1994) (holding that non-self-inculpatory, collateral portions of an otherwise self-inculpatory statement to the police should be treated as hearsay).  Raymond McNeil's statement that he wanted to kill Barnes before Barnes could kill him are also statements against his penal interest when coupled with the efforts he then made to obtain information about where Barnes lived so that he could

11

actually murder Barnes.  For the same reasons, the statement of Roy Walker regarding the fact that Barnes supplied him with a gun is admissible as a statement against Walker's penal interest as it exposed Walker to possible criminal prosecution.  *See United States* v. *Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (Rule 804(b)(3) requires only that the statement "tended to subject the declarant to criminal liability if it would be probative in a trial against the declarant . . . [and] does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution.") (citing and quoting *United States* v. *Garris*, 616 F.2d 626, 630 (2d Cir. 1980) and *United States* v. *Lang*, 589 F.2d 92, 97 (2d Cir. 1978)).

Finally, with regard to the statements of drug customers to cooperating witnesses that the customers were going to purchase drugs from Barnes, those statements are admissible as statements of the customers' intent to obtain drugs from Barnes at specific locations which were locations used by Barnes to distribute his drugs.  That these customers then actually entered the drug locations that they had identified corroborates their intent to obtain drugs from Barnes.

**II.   The Court Should Preclude the Defense from Eliciting Testimony or Evidence of Certain Prior Bad Acts of Several of the Government's Witnesses.**

The Government is seeking to limit the cross-examination of certain cooperating witnesses concerning particularly graphic

12

incidents of violence and prostitution.  These limitations are sought because cross-examination on these topics would serve only to inflame the jury, and, as these matters do not impact on the truth-telling abilities of these witnesses, cross-examination concerning these matters would serve no useful purpose.[3]

## A.    Background

One of the Government's cooperating witnesses, CW-1, will testify about his/her substantial criminal conduct, including drug dealing, extortion, street robberies, Hobbs Act robberies, and several crimes of violence committed by CW-1, including a number of gang-related stabbings.  The Government is seeking to limit the cross examination of CW-1 concerning the following two incidents:

- during a violent Hobbs Act robbery of a drug dealer committed by CW-1 and another person in approximately 2006, CW-1 tortured the drug dealer by cutting off two of the drug dealer's toes and

---

[3] The Government has discussed with defense counsel the likelihood that it would seek to limit the cross examination of one or more of its lay witnesses, particularly some of the 911 callers and eyewitnesses to the murder of Raymond McNeil, concerning prior arrests or convictions, mostly for drug offenses.  The defense has indicated that it would not seek to cross-examine such witnesses on such matters.  The Government intends to have a more detailed discussion with defense counsel concerning this matter when all the trial witnesses have been identified and details about their backgrounds are confirmed.  Should there be any disputes between the parties about the proper scope of cross-examination of the Government's non-cooperating witnesses, the Government will raise such issues immediately with the Court.

threatening to burn the drug dealer's testicles with a hot knife, all in order to convince the victim to disclose the location of drugs, money and guns

- when CW-1 was approximately thirteen years old in the 1980s, he and a group of teenagers targeted a man because they believed he was homosexual and attacked the man with knives, stabbing him multiple times

It appears as though the victims did not report the incidents to the police as the Government has been unable to locate any police reports documenting these crimes.  All of the other participants in these crimes are dead; the Government only learned about these incidents, including the graphic details of the violence perpetrated on the victims, from CW-1.

As to the robbery incident, the Government will elicit testimony from CW-1 about CW-1's participation in the robbery, including (1) that CW-1 and the other participant in the robbery were armed with guns when they entered the victim's house; (2) that the victim was restrained during the robbery; and (3) that the robbers stole a substantial amount of cocaine and firearms from the victim.  The Government seeks to limit CW-1's testimony on direct and cross-examination only as to the details described above.

As to the stabbing incident, given CW-1's age at the time, the age of the crime itself, and the fact that this was a hate crime, the Government does not intend to elicit any testimony

14

concerning this matter and would seek to bar the defense from examining CW-1 about this subject matter at all.

Another of the Government's witnesses ("CW-3") will testify about CW-3's long history of drug-dealing, much of which occurred out of CW-3's home in the Bronx and shoplifting.  The Government seeks to preclude the defense from cross-examining CW-3 about the following topics:

- CW-3's involvement in prostitution activities and in running a brothel in approximately 1995-1999 and 2010

- a domestic dispute that resulted in CW-3 shooting at CW-3's spouse after the spouse beat CW-3, an incident that occurred in January 1990[4]

- several fights between CW-3 and other persons that occurred approximately 20 years ago, in 1992 and 1993, including a fight involving a razor blade and several fistfights

Another of the Government's witnesses, CW-4, will testify about her extensive drug dealing and use of drugs over a course of many years.  The Government seeks to preclude the defense from cross-examining CW-4 about the following topics:

- the fact that CW-4 supported her drug habit by engaging in prostitution for a number of years

- the fact that CW-4 lost custody of two of her children at birth because the children were born addicted to crack cocaine and later voluntarily gave up custody of a third child when she went to jail

---

[4]    CW-3 was arrested as a result of this incident and received a term of probation, as noted on CW-3's rap sheet.

- CW-4's arrest in approximately 1999, and the events giving rise to that arrest, for endangering the welfare of a child, which occurred after CW-4 left one of her children with her husband and the husband left the child alone in an apartment

Another of the Government's witnesses, CW-5, will testify about his extensive drug dealing and use of drugs over a course of many years.  The Government seeks to preclude the defense from cross-examining CW-5 about the following topic:

- In 1972, CW-5 was arrested in North Carolina and charged with assault with intent to commit rape after he was falsely accused by a person who later dropped the charges.  Although this arrest appears on CW-5's rap sheet, no disposition is noted because the charges were dropped.

On January 31, 2009, a complaint was filed against another Government witness, CW-6, alleging that CW-6 physically assaulted a woman in a domestic incident.  According to CW-6, he did not assault the woman, and the woman ultimately withdrew the complaint.  In any event, this incident does not appear in any fashion on CW-6's rap sheet.

The matters discussed above do not impact on the ability of CW-3, CW-4, CW-5, and CW-6 to tell the truth and could only result in unnecessary embarrassment to these witnesses and further serve to distract the jury from the issues in the trial. For these reasons, the defendants should be precluded from questioning the witnesses about these incidents.[5]

---

[5]    Should the Court grant the relief the Government seeks, to the extent these incidents are set forth in any of

### B.    Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the right of a defendant in a criminal case to be confronted with the witnesses against him.  *Delaware* v. *Van Arsdall*, 475 U.S. 673, 678 (1986); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 955 (2d Cir. 1990).  "This means more than being allowed to confront the witness physically, for the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."  *Maldonado-Rivera*, 922 F.2d at 955 (internal quotation and citations omitted).

The Confrontation Clause does not, however, deprive the trial judge of all discretion in setting limits on cross-examination during trial:

> On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Ardsall*, 475 U.S. at 679.

Indeed, in keeping with these Constitutional principles, the Federal Rules of Evidence provide instructions for trial judges regarding the proper scope and subject matters of cross-

---

the cooperation agreements as relevant conduct, the Government would introduce redacted versions of those agreements at trial, obscuring such material.

17

examination.  *See Maldonado-Rivera*, 922 F.2d at 955-56.  Of particular relevance here, Rule 609(a) provides, *inter alia*, that evidence that a witness other than the defendant has been convicted of a crime shall be admitted, "subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year" or if the crime "involved dishonesty or false statement, regardless of the punishment."  "Crimes of force, such as armed robbery or assault, or crimes of stealth, such as burglary or petit larceny, do not come within" Rule 609(a)(2). *United States* v. *Hayes*, 553 F.2d 824 ,827 (2d Cir. 1977); *see also United States* v. *Estrada*, 430 F.3d 606, 614 (2d Cir. 2005). Likewise, the Second Circuit long ago noted that it is proper for a District Court to preclude questioning of a prosecution witness regarding sex crimes as having an insufficient bearing on the witness's credibility.  *See United States* v. *Rosa*, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it an abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility"); *United States* v. *Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (District Court properly precluded questions regarding "prior acts of sodomy upon young children" because such acts did not bear on the witness' credibility).

 The Federal Rules of Evidence further limit the introduction of evidence of prior acts by the witness that did *not* result in a

18

conviction.  Rule 608(b) provides that, "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence."  This rule gives broad discretion to the trial judge to limit cross-examination in this area.  It states that "in the discretion of the court, if probative of truthfulness or untruthfulness," specific instances of prior conduct "may" be inquired into on cross-examination "concerning a witness' character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b)(1).  Rule 611 makes clear, however, that "cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witnesses."  Rule 611(a) also provides that the court should "protect witnesses from harassment or undue embarrassment." Additionally, any such cross examination would have to satisfy the requirements of Rules 403 and 404(b).

### C.   Discussion

The graphic details of CW-1's violence against a drug dealer during a robbery and his participation in the stabbing of a man who was targeted by CW-1 and CW-1's friends because they perceived him to be gay are simply improper fodder for cross-

19

examination.[6]  Likewise, the crimes and acts outlined above concerning CW-3, CW-4 and CW-5 – that CW-3 engaged in prostitution and ran a brothel, engaged in street fights and shot at CW-3's spouse after the spouse beat CW-3, that CW-4 engaged in prostitution to support a drug habit, lost her children because of her drug habit, and that CW-5 was once falsely accused of rape – would in no way advance the jury's ability to determine whether these witness's trial testimony is truthful.

Crimes of violence and prostitution are not so probative of honesty or credibility that the defense should be given free reign to delve into the graphic details of the prior bad acts of CW-1, CW-2, CW-3, and CW-4 described above.  *See*, *e.g.*, *United States* v. *Salameh*, 152 F.3d 88, 131 (2d Cir. 1998) (holding that a trial court judge properly barred evidence of convictions more than 25 years old for robbery, assault, and sodomy).  Moreover, there can be no proper use of cross-examination about this conduct; it's only possible purpose would be to alienate the jury to a degree that it might be unable to properly assess the credibility of these witnesses.  In short, cross-examination on

---

[6]      In addition, both CW-1 and CW-6 have disclosed to the Government that when they were young teenagers, they and others beat up and harassed men they believed to be gay. For the same reasons that the Court should preclude any cross examination of CW-1's stabbing of a man CW-1 believed to be gay, the defense should be precluded from examining CW-1 and CW-6 about these incidents.

these subjects should be barred as it would likely confuse the jury without adding any probative value.

## III.      The Court Should Issue A Protective Order For 3500 Material.

The Government respectfully requests that the Court issue a protective order regarding the dissemination of material that will be produced pursuant to Title 18, United States Code, Section 3500 ("3500 material").[7]  Given the serious nature of the allegations in this case, the Government seeks an order requiring: (1) that the defense return or destroy all 3500 material (including all copies thereof), at the conclusion of the trial or when any appeal has become final; (2) that the defense is precluded from disseminating any 3500 material (and any copies) to anyone beyond the defendants, defense counsel, and any paralegal or staff employed by the defense; and (3) the defendants himself is precluded from taking any 3500 material (or any copies), or possessing any 3500 material in any jail facility, either before, during, or after trial; except that the defendants may review 3500 material in the possession of defense counsel when in the presence of defense counsel.

These requests are based on the need to protect Government witnesses, including witnesses both in and out of jail, from threats, intimidation, retaliation, violence, or any other

---

[7]      A proposed order is attached as Exhibit A.

21

tampering by the defendants or others acting on their behalf. The 3500 material contains highly sensitive information that witnesses provided to the Government regarding the statements and actions of the defendants and their co-conspirators. Much of the information was provided by cooperating witnesses who are themselves incarcerated, but a significant amount was provided by other witnesses who still live in the area of the Bronx where the murder of Raymond McNeil occurred.

The Government has learned, over years of prosecuting cases involving robbery, murder, and violence in furtherance of drug trafficking, that 3500 material such as this is used by incarcerated defendants to harass, threaten, and retaliate against witnesses. The Government is aware of instances arising from cases within this District in which the 3500 material of cooperating witnesses has been copied by defendants, passed around prisons throughout the country, and used as a basis for retribution and violence against the cooperators. These acts take place notwithstanding "separation orders" designed to keep defendants apart from witnesses who cooperate against them, precisely because the material is copied and passed to other prisons and other inmates who are not separated from the cooperators. Indeed, there are inmates in federal institutions who actively seek out cooperating witnesses to retaliate against, even if those witnesses did not cooperate against the inmates

22

themselves.  In prisons, an inmate's 3500 material is used as "evidence" that the inmate is or was a cooperator for the Government.

In addition to the danger posed to incarcerated witnesses, there is also a danger to witnesses who are not in custody, as well as to family members of cooperating witnesses, from the dissemination of 3500 material.  The witnesses have knowledge of certain details concerning the murder of Raymond McNeil, and are already — understandably — reluctant to testify.  These witnesses are extremely fearful for their safety and that of their loved ones should they be called to testify.

The defendants have friends and family members outside of prison who may know the Government's witnesses or may be able to locate them.[8]  The defendants are therefore in a position to cause others to approach and threaten or intimidate the witnesses.  That risk is vastly increased when the 3500 material is directly in the possession of an inmate, where it can be shown, dictated, read, or passed to visiting relatives and/or associates.

The risks of all of these forms of retaliatory conduct are magnified where the defendants and their relatives and associates have knowledge of, and contact with, the witnesses and their

---

[8]    Indeed, we understand that defense investigators have already located and interviewed, or attempted to interview, several possible civilian witnesses.

23

relatives and associates.  That is precisely the case here.  The defendants lived in the same areas as the Government's witnesses; the defendants and some of these witnesses have known each other for years, and in some cases had close relationships with each other.  The defendants also know members of the witnesses' families, and likely where some of them live.  In these circumstances, given the familiarity between the defendants, the witnesses, and their families, there is an even greater risk that allowing the defendants to maintain physical possession of the 3500 material will endanger the witnesses or their family members.

The only effective means of preventing defendants from copying or spreading the 3500 material of cooperating and lay witnesses is to preclude the defendants from taking such material with them into prison.  Recognizing this need for preventive action, many judges within this District have granted motions by the Government along the lines proposed here, and have issued protective orders precluding defendants from taking 3500 material that discusses cooperating witnesses and civilian witnesses into prison or keeping it with them in prison, or back to their home, as the case may be.  Such cases include *United States* v. *Elijah Bobby & Michael Williams*, S1 00 Cr. 1008 (NRB) (racketeering, narcotics conspiracy, murder); *United States* v. *Sean Carr*, S11 01 Cr. 490 (TPG) (racketeering, murder); *United States* v. *Freddy*

24

*Abad*, S2 01 Cr. 831 (GBD) (racketeering, Hobbs Act robbery, murder); *United States* v. *Rosalie Garcia, et al.*, S2 01 Cr. 1110 (GEL) (racketeering, narcotics conspiracy, murder);  *United States* v. *Darryl Henderson*, S9 02 Cr. 451 (RO) (racketeering, narcotics conspiracy, murder); *United States* v. *Lee & Williams*, S2 02 Cr. 602 (AKH) (murder for hire); *United States* v. *Martin Pedro*, S3 03 Cr. 346 (SHS) (armed bank robbery, Hobbs Act robbery, weapons offenses), *aff'd*, *United States* v. *Rivera*, 153 Fed. Appx. 758, No. 04-2999-cr, 2005 WL 2323170 (2d Cir. Sept. 23, 2005); *United States* v. *Nelson Martinez, et al.*, S30 04 Cr. 48 (JSR) (narcotics trafficking, weapons possession), *aff'd*, *United States* v. *Moore*, 322 Fed. Appx. 78, 2009 WL 1033608 (2d Cir. Apr. 17, 2009); *United States* v. *Cyril Smith*, S2 05 Cr. 922 (DLC) (narcotics trafficking, multiple murders); *United States* v. *Romeo Barnett*, 05 Cr. 1007 (JFK) (narcotics conspiracy, weapons possession and discharge); *United States* v. *Khalid Barnes, et al.* S9 04 Cr. 186 (SCR) (narcotics trafficking and murders); *United States* v. *Brandon Shaw, et al.*, 06 Cr. 41 (CM) (murder, narcotics conspiracy and gun possession); *United States* v. *Antonio Guerrero*, et al., 09 Cr. 339 (RWS) (multiple murders).

Precluding the defendants from taking the 3500 material that discusses cooperating witnesses or civilian witnesses with them into prison will not prejudice the defendants.  Defense counsel, of course, will still have full access to the material; the

requested limitation applies only to the defendants' personal possession of the material while in prison.  For example, the proposed order would not prevent the defendants from reviewing the 3500 material in attorney conference rooms at the prison or in the attorney's office, but would only preclude them from retaining the material after such meetings, and keeping it in the facility where it could easily be copied and disseminated. Because the Government will provide the 3500 material by April 14, 2010, far in advance of the date on which it is required to do so under the statute, counsel will have ample time to review the material with the defendants.

Moreover, the defendants may review the material prior to, during, and after court sessions each day of the trial, as long as they do not take the material with them back into the jail when they return at night.  Given the anticipated length of the trial, the defendants will have ample time to review the 3500 material.  *See, e.g.*, *United States* v. *Rivera (Pedro)*, 153 Fed. Appx. 758, 760 (2d Cir. 2005) (finding that a protective order issued by Judge Stein did not violate Section 3500 and did not impinge upon defendant's Sixth Amendment Right to assistance of counsel); *see also United States* v. *Moore*, 322 Fed. Appx. 78, 2009 WL 1033608, at *3 (2d Cir. Apr. 17, 2009) (finding that the district court was "within its discretion in preventing defendant's unsupervised possession of § 3500 material, which

included statements by cooperating witnesses, to protect such witnesses from intimidation and retribution").

## CONCLUSION

For the reasons set forth above, the Court should grant the Government's motions *in limine* in full.

Dated: New York, New York
      March 3, 2012

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York

By:    _____/s/_____
                  Laurie A. Korenbaum
                  Timothy D. Sini
                  Assistant United States Attorneys
                  Tel.: (212) 637-2266/2358

## AFFIRMATION OF SERVICE

Timothy D. Sini, pursuant to 28 U.S.C. § 1746, declares:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.  On March 3, 2012, I caused a copy of the foregoing Government's Motions in *Limine* to be served on the following by filing a copy via ECF:

George R. Goltzer, Esq.
200 West 57th Street, Suite 900
New York, New York 10019

Jill Shellow, Esq.
111 Broadway, Suite 1305
New York, New York 10006

Counsel for Defendant CALIEB BARNES

Mark DeMarco, Esq.
2027 Williamsbridge Road
Second Floor
Bronx, New York 10461

Counsel for Defendant GREGORY PLASKETT

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          March 3, 2012

_____/s/_____
TIMOTHY D. SINI
Assistant United States Attorney
(212) 637-2358